Good morning, and may it please the Court, Deputy Federal Public Defender Michael Tanaka, appearing on behalf of Jesus Ramos Cervantes. In this case, it's undisputed that the police wanted to search Mr. Ramos Cervantes' vehicle because they suspected that it contained narcotics. So what they did was they had it followed until they could get a reason to stop him, and then they wanted to develop a reason to search the car. It all went as planned. They stopped him, and then, aha, they found a reason to search. He didn't have a driver's license. The problem with that is that, in fact, he did have a driver's license. So the issue in this case is whether, at the time they decided to arrest him for not having a driver's license, was that reasonable? Did they have probable cause to believe that? The answer is no. Probably cause to believe what? That he was driving without a license. Well, he told them he didn't have a license. Well, he told them. They asked, and I think it's important to note that all this is through the context that he doesn't speak English, and the officer that is reporting this doesn't speak Spanish. But they stop him. They ask him for his ID. The officer says, and then they bring him out and do a pat-down. The officer says he normally, in that case, asks for whether he has ID and asks whether he has a wallet and checks for the ID. In this case, there's testimony that he doesn't recall whether the man had a wallet or not. Though, obviously, he did have a wallet, because when they booked him, he had a wallet. And what was inside that wallet was, lo and behold, ID. When they asked him about his name, he gave him an incomplete name. And then he told them that his license had been suspended. Did he not? That's correct, Your Honor. I wouldn't characterize it necessarily as an incomplete name. He gave him his name as Jesus Antonio Ramos. As we know, Ramos and Ramos Cervantes in Latin culture are pretty much identical. Your time is limited. Maybe I can get to my real question here. You spent a great deal of time in your briefs on whether the parties were justified in arresting him. But I'd like to know your position on the Fourth Amendment issue. Did the police satisfy the community caretaking doctrine under the Fourth Amendment when they removed your client's car from a residential street? Well, Your Honor, to be frank, I didn't argue that in the brief. I know, but we're interested in that. We argued below that they did not, that they didn't have cause under the California law to impound the vehicle based solely on what they later called a citation for driving without a license. There are a number of options that they have with respect to a vehicle that's on the street, and one of them is to call the registered owner, which showed up in their search. So we would argue here, as we did argue below, that they didn't satisfy that and that they had no cause for impounding the vehicle and therefore no cause for doing an inventory search, which should obviously be the requisite. You need valid cause to impound a vehicle before you can do a valid inventory search. Do you mean that rule that we're talking about where public safety is involved in obstruction of traffic and all that, that doesn't apply? It applies, Your Honor, but there are a number of steps that the police have to follow before they can just tow a car away or impound it. Were those steps followed? No, we submit that they weren't. One of them is that they have to contact the registered owner of the car, which was Ms. Triano. Is that in the statute that they need to contact the registered owner? I believe that's in one of the California statutes, Your Honor. I don't have that one. Yeah, I know. You didn't brief that issue. Citation at hand. You argued it below, but you didn't argue it here. It was just mystifying to me, but anyway, proceed. Well, you see, my understanding has always been that when it comes to towing your vehicle, that, you know, they can tow it, of course, if they find contraband in it, but contraband wasn't found here until, you know, they stopped them and all that. Am I right? That's correct. The way the impound would have to be determined before. Let's start from the beginning. What was the evidence that there was a stash house here? The evidence was the officer's bare assertion that he was watching a stash house and that he had gotten information before there was a stash house. He said it was a stash house. That's correct. There was nothing, no evidence that came in that tells us that he was watching. People were going in, vehicles were coming. He was taking license numbers. They were checking them against their records, to determine whether these people had prior narcotics arrests or convictions or all that. He just said it was a stash house. That's correct. And he got this information from another officer. Right? That's correct, Your Honor. All right. And he didn't have probable cause to stop your client at that time, did he? The police officer? We did argue that. What? Yes, I agree. He did not have probable cause. He didn't have probable cause. And we know that because when he radioed the other officers, he told them to go ahead and make out a legal stop or whatever it was. And then they spotted him and said that he didn't stop before the limit line, right? That's correct. Okay, they didn't say whether he stopped after the limit line. Some people stop after the limit line. But they said he didn't stop before the limit line. So they pulled him over for a traffic violation. Is that right? Yes. Yeah. And they didn't have probable cause then either. They didn't have probable cause to believe there was narcotics in the vehicle. But they had probable cause that he had broken a state law by not stopping at the limit line, correct? That's correct. Well, I missed what Judge Iacutis said. What was it? We're not contending that the stop itself was illegal or a traffic violation. The officers testified that they saw a traffic violation, and the judge found them credible. No, I'm not arguing that it is, yeah. So as a result, they had little bits of isolated information that were based basically on conclusory statements without a factual background for that, which didn't in total amount to probable cause to believe that he had narcotics in his car. I'd say the remaining minute or two, if we're done, the court has more questions. So you're saying then they had a right to search the car? No, you're not. I'm saying exactly the opposite. They didn't have probable cause to search the car for narcotics. Well, did they have a probable cause to search it for anything? No. Did they have a right to impound it? Was that okay? No. Really? That's our position. That there was nothing illegal about the impound? No, that the impoundment was, that they did not have a right to impound it. The impoundment was illegal. And the subsequent inventory search or the inventory search, the preceded impoundment was illegal. Tell us why the impoundment was illegal. The impoundment was illegal for two reasons. One, they didn't have reason to impound the car for a violation of the licensing statute. And two, they didn't have, they didn't follow the procedures that would, they wouldn't necessarily have to follow the validity of the impoundment card. Oh, so they didn't follow the internal procedures. All right. Good morning, Your Honors. May it please the Court, Kevin Rosenberg on behalf of the United States. There are two issues before the Court this morning. The first one is whether or not the district court properly found that the police officers in this particular case had probable cause to believe that this defendant was driving without a license and therefore properly impounded his vehicle and conducted an inventory search. The second one is whether the officers collectively had probable cause to believe that the defendant's vehicle contained contraband. The Court doesn't really even need to reach the second issue because the government believes that the Court can decide this issue solely on the first issue presented. And there are several reasons why, in this record, the officers had probable cause to believe that the defendant was driving without a license. First, when the officers pulled him over for failing to stop behind the limit line, a fact which the defendants do not contest the legality of that stop, when they pulled him over, they asked him for his driver's license, his insurance card, and his registration. And he said he could not find any of those documents and that he did not have a driver's license or any other identification. They asked him some additional questions to try and identify who he was and he said his name was Jesus Antonio Ramos. Now, according to the defendants' argument, if I stood up here and said my name was Kevin Scott, that would be an accurate identification. No, no, no. It doesn't work that way. You know, he had a hyphenated name and he had four different words in his name, didn't he? He did, Your Honor. Yeah, so he gave you two. What did he say his name was? Jesus Antonio Ramos. Did he say it all three? He did. Okay, well, for Spanish-speaking people, Ramos is the name that most of them go on when they come to this country. Their mother's name, right? Yes, I know. So he wasn't giving a false name in his mind. I don't know what the defendant was saying. Jesus Antonio Ramos. That's his name. Well, that's part of his name, Your Honor, and whether he intended to give a false name or not I think is really not the question. The question is because he didn't give a full name. When we say the case, Ramos Cervantes will say, well, that's the Ramos case. You might or you might say it's the Ramos Cervantes case. No, that's the way they say it here. Okay. Were you born in California? I was, Your Honor. Where'd you live? I lived in the valley, San Fernando Valley. And you don't know this? Where'd you go to high school? I went to Taft High School. Where? Taft High School. Taft High School? Woodland Hills. My kids graduated from there. That's where they were smoking pot during graduation 20 years ago. Okay. No, I understand, Your Honor. You know, this is not a big deal. No, and obviously there is a cultural factor here at play, but the point is that this fact combined with some others went up. Well, you had a – who were the officers there? Wasn't one of them a Latino? Yes. So he should know. Presumably. Unless he's Anglo-urbanized. I don't know if she is or not, Your Honor. Yeah. When the officers ran the name that the defendant provided, even the partial name, they weren't able to find a driver's license that matched that particular name. So they came back to the defendant, and they confronted him with this fact. And then he said that he'd been arrested for driving under the influence, his license had been taken away, and he was currently attending classes. So when you combine all these facts together. And he was speaking Spanish. The record's not clear on that point, Your Honor. I think that one of the officers said that she did not speak Spanish, so he must have been speaking Spanish. Well, she didn't speak Spanish. I don't think her partner did either. None of them spoke Spanish. The record on this point isn't clear. They were obviously able to communicate with him, and the language issue was never an issue that was raised before the district court or even before this court, that there's some inability for the defendant to understand what was happening at the time of the traffic stop. So, yes, Your Honor. Opposing counsel says that, assuming that the traffic stop was valid, which they don't contest, and then they do argue that the officer lacked probable cause to conclude that he was driving, that Mr. Ramos-Vantez was driving without a license. But let's assume for the moment that we agree with you that the officers did have probable cause. The opposing counsel then argues that the officers didn't follow the rules for impounding the car. Is that correct? That's not correct, Your Honor. Whether the officers followed the LAPD procedure was never challenged before the district court, and the district court specifically found the officers to be credible, and the officers stated in their declarations that they followed LAPD policy about impounding vehicles, and that fact was never challenged before the district court. Refresh my memory on that policy. The specifics of the policy are not laid out in the officer's declaration. It simply says that the vehicles were impounded pursuant to LAPD policy. That is found in excerpts of Record 56 for one of the officers, Officer Coley, and excerpt of Record 59 for the other officer. They didn't detail what the policy was, but it was never challenged. It was simply that they did, in fact, follow it. Was it raised as an issue in the district court, the community caretaking function with respect to impounding? It was. It was raised. It was raised in the brief, and the government responded to it, and the government... Why doesn't that apply? I think it does apply. The government argued that it does apply. Here you had a situation where this defendant was miles from home. He was by himself in a vehicle, and had the officers left this vehicle unattended on the side of the road, it could have imposed a safety hazard. How is that? What evidence is there of that? Of which particular point? That it would pose a hazard if we left parking there. Let me tell you, I used to be the judge in San Fernando back in 1965, and I've lived in the valley a long, long time. So where was he? It was the middle of the afternoon. Where was the hazard? I think additionally... What street were they on again? It was near Laurel Canyon. No, no, but what was the other street? Was he on Laurel Canyon? It was the intersection of Laurel Canyon and Polk, P-O-L-K Street. Yeah, okay. In the North Valley. And he was on Polk. Northeast Valley. He was at the intersection. Yes, Your Honor. And he crossed. He was on Polk. Wasn't he on Polk Street when he was driving, or was he on Laurel?  Well, I mean... He was at the intersection. Laurel's a big street, and is it in an area where you can't park your car because you can't park it between 4 and 7 or what? There's no evidence in the record about the parking restrictions at that time, but I think... So what was the evidence of a public hazard? Well, I think it's just the fact of leaving this vehicle. Also the fact that the vehicle could be subjected to being damaged in some way. I think the officers had a responsibility. Well, do you really think they worried about that? Probably not. So why tell me that? Well, I'm just responding to the court's question. I mean, this wasn't out of point. I'm sorry, Your Honor. So don't they usually maybe ask, is there an adult person that can come here and drive the car for you? That's probably... And when they saw his license, they found his license, didn't they? That was after they made the search. That was after the search and back at the station. Yes, Your Honor. Okay, but then he had his license. Well, they could have had him call one of his brothers or one of his friends to come down and take the car. Once you impound it, then the costs run up and up and up and up, and you'll end up at Pickup Park. That's true. And I think realistically, I don't think the court has to even get to that issue as well. I think the record is sufficiently developed as a factual and legal matter for the court to be able to decide this case on the first issue. The judge that handled this, he didn't go into all those things, did he? No, he didn't rule on the community caretaking issue either. Yeah, he didn't care about that, did he?  Did he bring it up? I'm sorry, Your Honor? Did he bring it up? I think that the defense brought it up. I believe the defense brought it up in their briefs. No rulings made on that. Correct, Your Honor. Is it your position that if the police were justified in arresting Cervantes for driving without a license, there is per se justification for impounding the vehicle? I think under the facts of this case, they were authorized to do so under the LAPD policy. I think it would depend on the particular departments if they had policies that permitted this. I think the officers have a choice as to how they proceed. I don't think they have to impound the vehicle, but I think under this circumstance, since they chose to do that, and of course we... But you can't tell us what that policy is. No, Your Honor, that wasn't developed as a factual matter. And Judge Walter, he didn't get into that either. Correct, because the policy wasn't challenged. The degree to which the officers may or may not have followed the policy was not challenged before the district court. How do you deal with United States v. Caceres, where the community caretaking doctrine is articulated? Deal with it in what way, Your Honor? How is that satisfied with what Judge Preggerson was getting at, where the car was parked on a residential street, not impeding traffic in any way, and there's nothing that I could find in the record to suggest the police considered any community caretaking factors before they impounded the vehicle? I think you're right. And that was my case, by the way. Okay. I think that you're right, Your Honor. There's nothing in the record that the officers considered that. And what the government relied on in making the argument before the district court was the Miranda v. City of Cornelius case that stated that an impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle. I'm a little surprised that you're saying the district court didn't rule on this because the district court, in fact, found there was an objective community caretaking rationale and distinguished Caceres. It said there the defendant was parked a mere two houses away from his home, while the defendant's car in this case was many miles from his home and there was no licensed passenger to drive the vehicle back to the home. So it wasn't unreasonable for the arresting officer to protect the car from vandalism or theft by impounding it. So the district court did, in fact, rule on it, but I guess I didn't see that that issue was before us today. It wasn't raised in the briefs. Well, I apologize. I didn't remember that that was the district court's ruling, so I'm sorry that I missed that, Your Honor. Thank you. Well, yeah, that's a distinction with little difference. Unless there are any additional questions, the government would submit on its briefs and argument, Your Honors. Thank you. Anything else? None. All right. That is submitted. And the other two cases on the calendar, U.S. v. Morgan Gonzales and U.S. v. Guillermo Arredondo Benitez, that's submitted as well. Okay. Thank you. And we'll recess until tomorrow morning or adjourn until tomorrow morning at 9 o'clock. Okay. All rise and participate in the recess until 9 o'clock tomorrow morning. I got it. Where did you see that?  Yeah, it was here. Okay. Keep your closed hands off your back. Blanca, I'll let you take these in for me here. If you don't mind. All right, sir. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Pregerson, Nelson D. W., Ikuta